```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
```

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>  )<br>    v.   )<br>  )<br>PHILLIP W. HYDE,  )<br>       Defendant  )<br>  ) | CRIMINAL NO. 04-10074-JLT |

### GOVERNMENT'S SENTENCING MEMORANDUM

The government submits this memorandum to present its position concerning sentencing.

**OFFENSE CONDUCT**

Phillip Hyde's late mother, Marian Hyde, retired from teaching in the Chicago Public School system in 1968 and collected monthly pension checks from the Chicago Teachers' Pension Fund until she died in April 1982 at the age of 82. During her retirement, Mrs. Hyde lived with her son Phillip in Massachusetts, where she received the pension checks by mail. When his mother died in 1982, Hyde did not inform the pension fund, and it continued mailing the monthly checks. Hyde forged his mother's signature on the backs of the checks and deposited them in a joint bank account in both their names.

In addition to forging his mother's signature on the checks, Hyde took other affirmative steps to mislead the Pension Fund to believe that his mother was still alive. For example, in

January, 1987, Hyde sent a letter, which he signed using his mother's name, notifying the Pension Fund of a change of address. In June 1987, Hyde forged his mother's signature to a tax withholding certificate and mailed it to the Pension Fund.  In September 1987, the Pension Fund sent a routine letter requesting that Mrs. Hyde verify that she had received her recent checks. Hyde forged his mother's signature to the document and returned it with a note stating that Marian "is frail and has good and bad days."

In 2000, the Chicago Pension Fund discovered Mrs. Hyde's name in a Social Security Administration database of decedents. When a Fund employee telephoned, Hyde told him that his mother was at Hyde's home recovering from a stroke and could not speak on the phone.  Obviously aware that the Pension Fund was suspicious and likely to inquire further, Hyde shortly after sent a letter to the Pension Fund stating that his mother had recently died.  The letter further thanked the Fund's staff for their support through the years and noted that his mother's medical bills had been paid through his employer's insurance.  The latter point was significant because the Pension Fund had being paying for her medical insurance and so would have discovered that she had not made any claims against it for treatment.  With the letter he sent to the Pension Fund, Hyde included a recent death notice for his mother which he had arranged to have published in

the Boston Globe.

In total, the Chicago Pension Fund was defrauded of $317,678.16. That loss consisted of about 220 checks totaling $269,411.53; another $9,019.25 in checks sent by the Pension Fund for the purpose of reimbursing Mrs. Hyde for overpayment of health insurance premiums; $25,222.65 paid to the IRS for tax withholding on funds paid to Mrs. Hyde; and $14,024.73 paid for health insurance premiums.

## I. SENTENCING

As a result of the Supreme Court's decision in United States v. Booker, 125 S.Ct. 738 (2004), the United States Sentencing Guidelines are no longer mandatory. However, in that decision the Court stated that even "[w]ithout the 'mandatory' provision, the Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals." Id., 125 S.Ct. At 764.

> The Act nonetheless requires judges to consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' §3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §3553(a)(1), (3), (5)-(7) (main ed. and Supp. 2004). And the Act nonetheless requires judges to impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or

vocational training and medical care.
Id., 125 S.Ct. at 764-65.  As the First Circuit recently stated,
"[u]nder the post-Booker approach, 'district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing,' subject to review by the courts of appeals for 'unreasonableness.'"  United States v. Antonakopoulos, __ F.3d __, 2005 WL 407365 at 5 (1st Cir. 2005), quoting Booker at 767.

In order to consult the Guidelines and take them into account when sentencing, the court must first determine the defendant's total offense level and criminal history, and rule on any motions for departures, before proceeding to consider the other sentencing factors and goals set forth in 18 U.S.C. §3553(a).

Here, the parties agree on the guidelines calculation.  The base offense level is 6, there is an 8 level increase for the loss of $317,678.16, there is a 2 level increase for an offense involving more than minimal planning and a 3 level reduction for acceptance of responsibility.  Thus, Hyde's total offense level is 13, for a sentencing range of 12-16 months.  Hyde has filed no motion for a downward departure.

### 18 U.S.C. §3553(A)

When sentencing a defendant, a sentencing judge must "consider" a number of factors, including the "nature and

circumstances of the offense, and the history and characteristics of the defendant." 18 U.S.C. §3553(a)(1). The sentencing court must also weigh the purposes of sentencing listed in the SRA, including the need for the sentence to 'reflect the seriousness of the offense,' deter future criminality, protect the public, and provide the defendant with needed training, medical care, or other correctional treatment. citing to 18 U.S.C. §3553(a)(2)(A-D).

A fair and reasonable consideration of those factors reflects that a sentence of 12 months imprisonment is appropriate in this case.

### Nature and circumstances of the offense

Hyde engaged in criminal conduct on a monthly basis for nearly 20 years. Hyde tries to characterize his crime as an offense of omission, but in fact he took significant affirmative steps to perpetuate his offense, by forging his mother's signature on every check and sending false and forged documents to the pension fund. Moreover, although the direct victim of Hyde's crime was the pension fund, the true victims were the beneficiaries of that fund, people like Hyde's late mother - individuals who devoted their lives to public service by teaching young people and who earned the right to retire in dignity with a pension.

### Hyde's history and characteristics

Hyde's history and characteristics further support imposing a sentence of imprisonment. Hyde is a well educated man, having received two masters degrees, one from Harvard and another from NYU. Thus, he not only knew well enough not to commit this crime, but he was educated and experienced enough to have been working for a living rather than defrauding a pension fund. Hyde suggests in his sentencing memorandum that because he used his criminal proceeds to support his family, that mitigates somewhat the evilness of his intent. To the contrary, it highlights Hyde's weakness of character, that he preferred to steal rather than use his education and skills to earn a living. Moreover, he chose to steal from a pension fund, an entity supporting people who had worked for their livings and earned the checks they received from the pension fund.

Although Hyde pays lips service in the PSR to wanting to work out a repayment plan with the pension fund, his effort to avoid having to make reimbursement by filing for bankruptcy speaks far louder. PSR at pg. 17. Hyde's lack of remorse as reflected by that action further supports a sentence of imprisonment. There is no information suggesting that Hyde has taken any steps to make restitution to the fund.

Hyde argues that his age and soft physical condition are factors the court should consider in imposing sentence. However,

6

there is simply nothing extraordinary about either his age or health.  More importantly, it is clear that Hyde would be imprisoned in a minimum security setting with other white-collar criminals like himself, not the type of "predators" Hyde argues would be waiting for him within the federal prison system.

As for Hyde's family situation, there can be little doubt that Hyde's incarceration would have a negative impact on his relationship with his teenage son.  However, the PSR reports that his son is now in a well-respected high school and has the choice of at least four families to live with for the period while his father is in prison, which will in no event be greater than 12 months.  To sentence Hyde to probation with or without home confinement would send a poor message not only to Hyde, but also to his nearly-grown son.  Hyde's son should learn that committing a fraud over 20 years and stealing over $300,000 will result in a prison sentence, regardless of one's family circumstances.  That same message needs to be sent to the general community which is well aware of Hyde's case, that there are consequences for one's actions and punishment must be imposed for serious crimes.

Hyde argues that he has suffered enough because of the shame brought about by the publicity of this case.  It is appropriate that he feels shame, but that is no substitute for punishment.

Finally, he argues that if he were imprisoned, he could not support his son or do anything productive.  But according to the

7

PSR (¶76), Hyde has not been productively employed since 1993. Supporting his son has consisted only of stealing from the pension fund and collecting social security.  In short, Hyde has not been a productive member of society for more than a decade. There is no reason to believe he would become one now if he avoids a prison sentence.

### CONCLUSION

Hyde's crime was serious because of the amount stolen, the length of his conduct and the type of victim.  Nothing about Hyde's background or family circumstances justifies anything less than a 12 month prison sentence and restitution to the pension fund.

>Respectfully submitted,
>
>MICHAEL J. SULLIVAN
>United States Attorney
>
>By:
>   /s/ Mark J. Balthazard
>  MARK J. BALTHAZARD
>  Assistant U.S. Attorney

Date: April 15, 2005

### CERTIFICATE OF SERVICE

I, Mark J. Balthazard, Assistant U.S. Attorney, hereby certify that a copy of the foregoing document will be served, via electronic filing, on John H. LaChance, Esquire, and a copy of the foregoing document will be served, via hand delivery, on Sean Buckley, U.S. Probation Officer, this 15th day of April, 2005.

>/s/ Mark J. Balthazard
>MARK J. BALTHAZARD
>Assistant U.S. Attorney